

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-14-2003

# Mulanga v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-3332

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Mulanga v. Atty Gen USA" (2003). *2003 Decisions*. Paper 82.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/82

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 02-3332

———

BEATRICE MULANGA,

Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States of America,

Respondent

———

On Petition for Review of an Order
of the Board of Immigration Appeals
INS No. A78-527-646

———

Argued: July 21, 2003

Before: ALITO and FUENTES, *Circuit Judges*
and SURRICK,* *District Judge*

(Opinion Filed: November 14, 2003)

THOMAS W. VANASSE, ESQ.
  (Argued)
New York Association for
  New Americans
17 Battery Place, 9th Floor

ATTORNEY FOR PETITIONER

———

* The Honorable R. Barclay Surrick, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General
Civil Division
ERNESTO H. MOLINA, JR.
Senior Litigation Counsel
ANTHONY C. PAYNE (Argued)
Trial Attorney
Office of Immigration Litigation
Civil Division
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

ATTORNEYS FOR RESPONDENT

Nadine K. Wettstein, Esq.
American Immigration Law
Foundation
918 F Street, N.W.
6th Floor
Washington, D.C. 20004

ATTORNEY FOR
AMICUS-APPELLANT

---

**OPINION OF THE COURT**

---

FUENTES, *Circuit Judge*:

Beatrice Mulanga, a citizen of the Democratic Republic of the Congo, petitions for review of the Board of Immigration Appeals' ("BIA") order dismissing her appeal from the Immigration Judge's ("IJ") denial of her application for asylum and withholding of removal. Mulanga argues that the IJ erred by unreasonably requiring her to provide evidence corroborating her husband's political affiliation and by discrediting two aspects of her account of persecution. She also asserts that the BIA violated her due process rights and INS regulations by summarily affirming the IJ's decision.[1] The government counters that the IJ's

---

1. The American Immigration Law Foundation filed a brief as Amicus Curiae for Mulanga urging the Court to invalidate the summary affirmance procedure used by the BIA in this case. Because we remand for other reasons, we do not address the arguments concerning the summary affirmance procedure.

decision is supported by substantial evidence and that the BIA properly affirmed without opinion the IJ's determination that Mulanga failed to satisfy her burden of establishing eligibility for asylum and withholding of removal. We conclude that: (1) petitioner should have been given an opportunity to provide corroborating documentation of her husband's political affiliation or, if she could not produce such evidence, an opportunity to explain her inability to do so; and (2) the decision is not supported by substantial evidence. We therefore grant the petition for review.

## I.  *Factual and Procedural Background*

### A.  *Factual Background*

Except as otherwise noted, the following account is based on two sources. First, the events relating specifically to Mulanga and her family are based on Mulanga's testimony (the credibility of which is disputed). Second, information about political events and conditions in the Democratic Republic of Congo (DRC) is taken from the U.S. State Department Reports which she introduced into evidence. Mrs. Mulanga was born on June 4, 1959, in Zaire, now called the Democratic Republic of the Congo ("DRC"). In 1978, she married Celestin Kabamba, a high school teacher. Their seven children were born in Kinshasa between August 1978, and January 1992. Mrs. Mulanga's husband was a member of the opposition party, the Union for Democracy and Social Progress ("UDPS"). According to Mrs. Mulanga, the UDPS fought the dictatorship in order to establish a democracy. She testified that her husband worked "for the young of the party, trying to get them together. He was the local person . . . His primary function was to work with the young people and to help them how to function within the party. And then, to help them not to be afraid what's going around." A.R. at 154. Her own involvement with the UDPS consisted of taking part in the group's protest rallies. Also, she often cooked for the party members.

On April 4, 1995, security agents of the government of

Mobutu Sese Seiko[2] arrested her husband because of his political beliefs. Mrs. Mulanga testified that he was detained in a "house of the government" for two days and beaten badly, which left "his face puffed and a lot of scars on his arms." *Id.* at 155-56. He was released when representatives from the UDPS pleaded with the government to release him.

In June 1995, Mrs. Mulanga participated in a protest march organized by UDPS in Kinshasa, the purpose of which was "to fight the dictatorship" and "the restoration of democracy." *Id.* at 157. One of Mobutu's soldiers who was trying to keep the march from taking place shot Mulanga in the chest. She fell unconscious and was taken to the Clinic Ngaliema, where she stayed for three and a half weeks. Mrs. Mulanga supplied a medical certificate from Dr. Okenge, who treated her at the Clinic shortly after the shooting. An INS medical report confirms that Mrs. Mulanga was shot, noting that she sustained a second degree gunshot wound.

In 1997, a political change occurred. Laurent-Desire Kabila forcibly took over Zaire, thereby ending the regime of Mobutu. He renamed the country the Democratic Republic of the Congo. *See id.* at 333. He ruled by decree, without the constraint of a constitution, and formed "People's Power Committees" to monitor activities of citizens at their neighborhoods, schools, and workplaces. *Id.* According to the 2000 State Department Report, his government was responsible for human rights abuses, including "extrajudicial killings, disappearances, torture, beating, rape and other abuses." *Id.* at 334. Also, the judiciary was corrupt and it permitted arbitrary arrests and detentions to become common. *See id.* at 333, 341. "Security forces . . . used arbitrary arrest to intimidate outspoken opponents and journalists. Charges rarely were filed, and the political motivation for such detentions was obscure . . . [d]etention without charge [was] a frequent problem under the Kabila administration . . . [t]here were many secret or unofficial detention centers in Kinshasa. . . ." *Id.* at 341.

---

2. The DRC became independent from Belgian rule in 1960. Mobutu Sese Seiko ruled the country from 1965 to 1997, when Laurent-Desire Kabila came to power.

After Laurent Kabila came to power in 1997, petitioner and her husband continued to have problems because of their political beliefs. During 1998, security forces would often come to their home "to arrest [Mr. Mulanga] because of his political beliefs" and "to get him to get out of the political scene." *Id.* at 159. Mrs. Mulanga testified that the Laurent Kabila government was "looking for him because of his politics, and he was anti-government." *Id.* at 183. Mr. Mulanga often fled to friends' houses when the authorities came looking for him.

In May 1998, petitioner went to a local clinic because she was having problems with her chest. During her absence, her three youngest children stayed at the local church while her husband stayed at home with the four oldest children. When she returned home, neighbors told her that people had come to the house looking for her husband and that he and the children who were with him ran and jumped the fence in the back of the house. She waited in her home for her husband and children to return. They never did. She has not seen her husband or children since that day and does not know their whereabouts.

Two or three days later, Kabila security agents came to Mulanga's home at 1:00 in the morning, showed her their cards, and demanded to know the whereabouts of her husband. They told her that "if you don't show us where your husband is, that's going to be a problem." *Id.* at 166. According to Mrs. Mulanga, they said her husband had "been doing a bad thing . . . [a]nd they said that, you people, you're anti-Kabila doing the politic here." *Id.* The security agents stayed in petitioner's home for about 15-20 minutes, during which time they taped her mouth and beat her up while saying "you've got to tell us the whereabouts." *Id.* at 167. They then pushed her into their car and drove about an hour to the government house in Kinsuca, where seven other people were being held. She was held at the house for 6 days, during which she was given no food, repeatedly asked the whereabouts of her husband, beaten, and pulled to the ground by her hair.

On the sixth day, Mulanga escaped from the government house with the help of a Kabila soldier named Alfonse, who was a friend of hers and of her husband. She testified that

Alfonse "came there and they called my name and he helped me to get out of there." *Id.* at 168. Alfonse brought petitioner to the Zaire River (Congo River), where she boarded a boat along with two other people headed for Brazzaville in the Republic of the Congo, a separate country. She entered Brazzaville and remained there from June to November 1998 with Marie Jean Ngalulu, a woman from her village.

While Mulanga was in Brazzaville, civil war broke out. *See id.* at 239. As a result, there was destruction and looting in much of the southern part of the country, "particularly in Brazzaville, where more than one-third of the country's population normally resides. Fighting and heavy looting led to the destruction of many southern towns, and much of Brazzaville, the capital. An estimated 800,000 civilians, approximately one-third of the country's estimated population of 3 million, were displaced." *Id.* As petitioner and her friend ran, shots were fired. Her friend was hit by a bullet. When she noticed her friend on the ground, not moving, Mulanga kept running for her life. She ended up at the Bethel church where she was taken in and allowed to stay for 3 years.

While Mulanga was at the Bethel church another political change occurred in her former country. On January 16, 2001, Laurent Kabila was assassinated by one of his guards. His son, Joseph Kabila, took control of the government of the DRC 10 days later. *See id.* at 212. As his father had before him, Joseph Kabila ruled by decree and without the constraint of a constitution. According to the State Department, security agents monitored mail passing through both private carriers and the DRC's "dysfunctional" state mailing system and there was a widespread belief that the government monitored telephone communications. *See id.* at 224. Although there were fewer reported cases of human rights abuses, "[i]n general security forces committed these abuses with impunity. Prison conditions remained harsh and life threatening. Security forces continued to arbitrarily arrest and detain citizens; however, the number of such cases decreased. Prolonged pretrial detention remained a problem, and dozens of suspects remained in detention without formal charges filed, without

any evidence presented against them, and without an opportunity to defend themselves in court." *Id.* at 213. The 2001 State Department Report also indicates that "[t]he Government operated 220 known prisons and other places of detention, and in all such facilities, conditions remained harsh and life threatening; there reportedly were many other secret or informal detention centers." *Id.* at 219.

Other abuses which continued during the Joseph Kabila regime were also noted by the 2001 State Department Report:

> There was no known action taken against the members of the security forces responsible for torturing, beating, or otherwise abusing the persons in the following cases from 2000: The November assault and shooting of Athanese Matenda Kyelu; the November beating of 10 students; the October beating and torture of 2 military court officials; **the October detention and beatings of 7 members of the opposition Union for Democracy and Social Progress (UDPS);** the May beating to death of Mukoko and the torture of his family; the May killing of Nsaiala Nkia Mbiyavange, beating of his parents, and rape of his sister; the April beating of Koyagialo Ahonzim Wasana; the April torture of Freddy Lomboto wa Lomboto; the March public raping of a young girl; the March beating of the president of the Front for the Survival of Democracy (FSD); the March beating and torture of 2 refugees; the February torture and harassment of residents of villages surrounding Dingi-Dingi; the February torture and beating of Zuki Phu Kuta Dieudonne, a reporter for the newspaper Palme d'Or and president of the human rights NGO Justice Sans Frontiere; the January torture of Freddy Loske Lisumbu, editor of the newspaper La Libre Afrique; the January death by torture of Iyela Mokolo; **the January torture of UDPS activist Crispin Ipondo Banda;** the January beating of Christophe Kalonji Ntambwe and his wife; and the January torture of Albert Angbana Mate by the ANR.

*Id.* at 218 (emphasis added). Also, according to the State Department, although the government adopted a law liberalizing political activity, 5 UDPS members were

arrested after they submitted a request to hold a public rally without submitting party registration papers. "They were charged with assault against state security, incitement to revolt, and sedition." *Id.* at 220. Needless to say, at least through 2001, government agents continued to target members of the UDPS in a crackdown on political activity.

Petitioner testified that she was afraid to return to the DRC after Joseph Kabila took control of the government in 2001 because "it's the same thing, father and son." *Id.* at 180. In June 2001, after a family member obtained a Canadian passport for her, Mrs. Mulanga fled Brazzaville "because of the violent things that were going there at the time." *Id.* at 175. She headed for Abidjan, Ivory Coast, where she remained for one month. About a month later, she arrived in the United States. Petitioner testified before the IJ that she was afraid to go back home "[b]ecause [Kabila's security forces] see me as anti-Kabila and I have never shown them the whereabouts of my husband. They say I'm involved in the politics, so they will do those bad things." *Id.* at 177.

In addition to U.S. State Department Reports, petitioner tendered documentary evidence in support of her account. As previously stated, petitioner obtained and introduced into evidence a medical certificate from Dr. Okenge, in which he stated that petitioner came into the emergency room in 1995 and that "[w]hen she arrived, the patient had a large bullet wound which had come very close to the left side of the chest cavity." *Id.* at 285. An INS medical report also confirms that petitioner sustained a second degree gunshot wound. *See id.* at 326. Additionally, petitioner introduced into evidence a letter from her cousin, Baidouin Mwanza Ngoie Jezu Ntumba, in which he confirmed that petitioner had been shot during a demonstration and that security forces were searching for her husband when they detained her. *See id.* at 275. Petitioner also supplied her birth and marriage certificates and offered to introduce her children's birth certificates. *See id.* at 104.[3] Petitioner also

---

3. In his closing statement, Mulanga's counsel offered to introduce the birth certificates into evidence, *see id.* at 203, after the IJ expressed great skepticism as to whether petitioner had children. *See id.* at 189 ("Ma'am, do you have these children? Are they a figment of your imagination? Do they really exist?"). It appears that, ultimately, the birth certificates were not included as part of the record. *See id.* at 210.

introduced into the record reports by Amnesty International, Human Rights Watch, and other organizations, describing human rights abuses in the DRC and the Republic of the Congo.

## B.  *Procedural Background*

Petitioner arrived at John F. Kennedy International Airport on July 9, 2001. Thereafter, she was detained in the Elizabeth Detention Center in Elizabeth, New Jersey.[4] On July 24, 2001, an INS asylum officer found her to have demonstrated a credible fear of persecution and torture and issued her a Notice to Appear. *See id.* at 449. Petitioner admitted to the Immigration Judge that she attempted to enter the United States with a fraudulent Canadian Passport, *see id.* at 82, and thereafter submitted to the Immigration Court her application for asylum pursuant to § 208 of Immigration and Nationality Act ("INA"), withholding of removal pursuant to INA § 241(b)(3), and for relief under the Convention Against Torture.[5] An evidentiary hearing on the merits of petitioner's application was held on March 20, 2002.

On April 4, 2002, the IJ denied petitioner's application and ordered that she be removed to the DRC from the United States pursuant to the charges in the Notice to Appear. A.R. at 65. Specifically, the IJ held that she had failed to meet her burden of proving persecution or a well-founded fear of persecution on account of her husband's political opinions being attributed to her. The IJ found that there was no record evidence showing that Mr. Mulanga was a UDPS member or that he was a vocal opponent of the government. The IJ also held that petitioner did not show that the April 1995 beating of her husband was politically motivated.

---

4. At oral argument, Mulanga's counsel told the Court that Mrs. Mulanga was paroled from detention due to a medical condition some time after the removal proceedings before the IJ.

5. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

Additionally, the IJ questioned petitioner's testimony on two points. The IJ noted that petitioner asserted in her airport statement that she did not know who shot her, but later testified at her hearing that she was shot by one of Mobutu's soldiers. The IJ found "incredulous" petitioner's account of her escape from the government detention house with the help of Alfonse, "question[ing] the ease with [which] she 'escaped' " and noted that no mention of Alfonse was made in petitioner's asylum application. *Id.* at 64. The IJ also noted that petitioner had lived in the DRC from 1995 to 1998 with no incident. Based on the lack of evidence that Mr. Mulanga's 1995 arrest was politically motivated, the supposed inconsistency between the airport statement and petitioner's testimony, the IJ's rejection of petitioner's account of her escape with Alfonse, and the relative calm experienced by Mulanga between 1995 and 1998, the IJ held "this Court is not convinced that these incidents amount to past persecution of the respondent." *Id.*

Finally, the IJ found that petitioner did not establish a well-founded fear of persecution if returned to the DRC because she did not testify to any incidents occurring after 1998 and had no knowledge of her husband's whereabouts or political activities. The IJ observed that there was no reason to believe that the new regime in power in the DRC was actively pursuing petitioner.

Petitioner timely filed a Notice of Appeal to the BIA. On July 26, 2002, the BIA affirmed, without opinion, the Immigration Judge's decision. On August 23, 2002, petitioner filed a Petition for Review and Motion for Stay of Removal. This Court granted petitioner's Motion for Stay of Removal on September 17, 2002.

## II. *Jurisdiction and Standard of Review*

This Court has jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1). *See Abdulai v. Ashcroft*, 239 F.3d 542, 548 (3d Cir. 2001). Where, as here, the BIA defers to the decision of the IJ, we review the decision of the IJ. *See id.* at 549 n. 2 (citation omitted).

Whether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual question, which we review under the substantial evidence standard. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Adverse credibility determinations are also reviewed for substantial evidence. *See id.* "We will uphold the findings of the BIA to the extent that they are supported by reasonable, substantial and probative evidence on the record considered as a whole, and will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the BIA did." *Kayembe v. Ashcroft*, 334 F.3d 231, 234 (3d Cir. 2003) (citing *Gao*, 299 F.3d at 272). *See also Zubeda v. Ashcroft*, 333 F.3d 463, 471 (3d Cir. 2003).

### III.  *Legal Standards*

The basic principles underlying Mulanga's claim are well established. The Attorney General has the discretionary power to grant asylum to an alien who qualifies as a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1). A refugee is "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A). As previously stated, Mulanga appeals the denial of her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

To establish eligibility for asylum based on past persecution, an asylum applicant must show: (1) one or more incidents rising to the level of persecution; (2) that is "on account of" one of the statutorily-protected grounds; and (3) is committed either by the government or by forces that the government is either unable or unwilling to control. *Gao*, 299 F.3d at 272 (citing *Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000)). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1);

*Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003). "That presumption can be rebutted if the INS establishes by a preponderance of the evidence that the applicant could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer reasonable." *Id.* at n.3 (citations omitted). "Where past persecution is not established, '[a]n applicant can demonstrate that she has a well-founded fear of future persecution by showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country.'" *Abdulrahman*, 330 F.3d at 592 (citing *Gao*, 299 F.3d at 272). Once an asylum applicant shows that "[s/]he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility[,]" the Attorney General may, but is not required to, grant asylum. *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir. 1997) (citation omitted).

Asylum applications constitute simultaneous applications for mandatory withholding of removal. *See* 8 C.F.R. § 208.3(b). In order to qualify for withholding of removal, an applicant must show a "clear probability" that his or her life or freedom would be threatened if s/he is deported. *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citing *Chang*, 119 F.3d at 1066). "The question under that standard is whether it is more likely than not that the alien would be subject to persecution." *INS v. Stevic*, 467 U.S. 407, 424 (1984). The standard for eligibility for withholding of removal is more exacting than the asylum standard. *See Chang*, 119 F.3d at 1066. "Thus, if an alien fails to establish the well-founded fear of persecution required for a grant of asylum, he or she will, by definition, have failed to establish the clear probability of persecution" standard for withholding of removal. *Zubeda*, 333 F.3d at 469-70 (citation omitted).

In order to obtain relief under the Convention Against Torture, an applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Sevoian v. Ashcroft*, 290 F.3d 166, 175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)).

Once an applicant establishes a claim for relief under the Convention Against Torture, s/he may not be removed to the country where the torture occurred. *Zubeda*, 333 F.3d at 472.

The burden of establishing eligibility for asylum, withholding of removal under INA § 241(b)(3), and relief and the Convention Against Torture is on the applicant.[6] "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. §§ 208.13(a), 208.16(b), (c)(2). However, as discussed in greater detail below, otherwise-credible applicants may be required, under certain circumstances, to provide corroborating evidence in order to meet their burden of proof. *See Abdulai*, 239 F.3d at 554.

## IV. *Analysis*

### A.

The parties' dispute in this case concerns the IJ's assessment of the sufficiency of the evidence presented by Mrs. Mulanga during her removal proceedings. Her primary contention is that the IJ unreasonably required her to provide corroborating documentation of her husband's political party affiliation in support of her claims of past persecution on account of imputed political opinion and membership in a particular social group.[7] Mulanga insists

---

6. *See* 8 C.F.R. § 208.13(a) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act."); 8 C.F.R. § 208.16(b) ("The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion."); 8 C.F.R. § 208.16(c)(2) ("The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.").

7. We note that an applicant can establish eligibility for asylum or withholding of removal based on persecution on account of either a political opinion s/he actually holds or on the basis of one imputed to him or her, whether correctly or incorrectly, by a foreign government. *See Balasubramanrim*, 143 F.3d at 164 n. 10.

that the IJ's corroboration requirement together with the IJ's disbelief of Mulanga's escape from the government house and her account of her shooting resulted in findings not supported by substantial evidence in the record.

In *Abdulai v. Ashcroft*, we observed that "[t]he INA is completely silent as to whether, when it is reasonable to expect corroborating evidence, an otherwise-credible applicant who neither produces such corroboration nor adequately explains his or her failure to do so may be deemed to have failed to meet his or her burden of proof." 239 F.3d at 552. We explained that "[s]aying that something may be enough is not the same as saying it is *always* enough [and that] . . . in fact, the most natural reading of the word 'may' [in the context of 8 C.F.R. §§ 208.13(a) and 208.16(b)] is that credible testimony is neither per se sufficient nor per se insufficient. In other words, 'it depends.' " *Id.* (emphasis in original). Applying principles of *Chevron*[8] deference, we upheld in *Abdulai* the corroboration rule set out in *In re S-M-J*, Interim Decision 3303 (BIA 1997), and we formulated a three-part inquiry: (1) an identification of facts for which "it is reasonable to expect corroboration," (2) an inquiry as to whether the applicant has provided information corroborating those facts; and, if he or she has not, (3) an analysis of whether an applicant has adequately explained why s/he was unable to do so. *Abdulai*, 239 F.3d at 554.[9]

---

8. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837, 843 (1984) (When reviewing "an agency's construction of the statute which it administers . . . if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

9. In *S-M-J-*, the BIA held that:

> Unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided . . . If the applicant does not present such information, an explanation should be given as to why such information was not presented . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.

21 I. & N. Dec. 722, 725-26.

In *Qui v. Ashcroft*, the court noted that before rejecting an applicant's petition for lack of sufficient corroboration, "the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner." 329 F.3d 140, 153 (2d Cir. 2003) (citing *Diallo v. INS*, 232 F.3d 279, 285-90 (2d Cir. 2000)). The Second Circuit also cautioned that "[u]nless the BIA anchors its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide, there is a serious risk that unreasonable demands will inadvertently be made." *Id.* Additionally, the Court in *Qui* noted that the requirement that an adjudicator support his or her demand for corroborative evidence with a reasoned explanation that conforms to the actual conditions in the applicant's former country of residence "constitutes one small, but crucial, defense against potentially mistaken, culturally based assumptions about the existence and availability of documents." *Id.* at 154.

In addition to laying the foundation for the three-part corroboration requirement, the BIA has commented on the relationship between the burden of proof and the role of the IJ in deportation hearings. In *S-M-J-*, the BIA opened its analysis with a discussion of the unique nature of such proceedings. The BIA explained:

> Although we recognize that the burden of proof in asylum and withholding of deportation cases is on the applicant, we do have certain obligations under international law to extend refuge to those who qualify for such relief. See United Nations Convention Relating to the Status of Refugees, July 5, 1951, 189 U.N.T.S. 150. Congress incorporated the international obligation into domestic United States law when it enacted the withholding of deportation provision of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, prohibiting the refoulement of refugees. Going beyond the refoulement provision, Congress also established asylum as a discretionary form of relief for those who could meet a lesser standard of proof. See section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). Because this Board, the Immigration Judges,

and the Immigration and Naturalization Service are all bound to uphold this law, we all bear the responsibility of ensuring that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim.

****

Although the burden of proof in establishing a claim is on the applicant, the Service and the Immigration Judge have a role in introducing evidence into the record.

21 I. & N. Dec. at 723-26. Thus, asylum and withholding of removal cases are different from other types of cases because, while the burden of proof is borne by the applicant, the IJ and the INS have a responsibility to make sure that qualified applicants are provided refuge in accordance with the obligations imposed by international law. As we explained in *Senathirajah v. INS*, "[t]he procedures for requesting asylum and withholding of deportation are not a search for a justification to deport. Justice requires that an applicant for asylum be given a meaningful opportunity to establish his or her claim." 157 F.3d 210, 221 (3d Cir. 1998).

Against this background, we believe the IJ's findings and conclusions regarding corroboration are not supported by substantial evidence in the record. In the first instance we note that the IJ and counsel for petitioner engaged in a colloquy about the documents that would be presented in support of Mulanga's case. Counsel represented that attempts were being made to obtain the birth certificates of Mulanga and her seven children, a marriage certificate, and a doctor's certificate with the help of Andre Kalanzo, an "unofficial representative" to the United Nations from the UDPS party. A.R. at 99-100. When counsel told the IJ that Mr. Kalanzo was in the United States and would be obtaining the documents through a contact person in the DRC, the IJ asked if this person was going to send the birth and marriage certificates and asked that he submit an affidavit in order to establish chain of custody. *See id.* at 113-15. The IJ also asked counsel to obtain evidence, such as an affidavit, from the church group with which Mulanga

sought refuge in Brazzaville and to find out whether Mulanga had family in Canada, where she initially wanted to go. *See id.* at 115.

Mulanga provided most of the documentation requested by the IJ. With the help of her cousin, she was able to supply her marriage and birth certificates.[10] She also came forward with a medical certificate from the doctor who treated her for her gunshot wound and an INS medical report confirming that she had sustained a second degree gunshot wound. Additionally, her cousin sent a letter confirming that (1) Mulanga was shot in the chest during a demonstration which Mobutu's security forces were trying to stop, (2) security forces "got their hands on her" while searching for her husband, (3) she managed to escape to Brazzaville, and (4) he thought that Mr. Mulanga and the children were dead. *Id.* at 275. Mulanga also supplied country condition reports for both the Democratic Republic of the Congo and the Republic of the Congo, which document flagrant human rights violations and corroborate her assertion that UDPS members are persecuted for their political opinions. This evidentiary showing is consistent with *S-M-J-*'s recommendation that asylum applicants provide country condition reports and documentation in support of facts that are central to their claims, such as evidence of place of birth and medical treatment. 21 I. & N. Dec. at 725.

However, despite the citation of *Matter of S-M-J-* in the IJ's decision, she did not apply its standards to the facts of this case. The IJ identified in her decision facts for which corroboration was sought, *i.e.* Mr. Mulanga's membership in the UDPS and whether it motivated his 1995 arrest and beating. However, prior to issuing the decision the IJ gave no hint that Mulanga should have come forward with evidence corroborating Mr. Mulanga's membership in the UDPS or with evidence that his arrest and beating in 1995

---

10. At oral argument, Mulanga's counsel represented to the Court that he asked Mr. Kalanzo, the UDPS representative to the United Nations, for help obtaining documentation, but that Mr. Kalanzo left for South Africa the day his help was requested, remained there for the next two years, and was not in touch thereafter.

were politically motivated. First, in regard to Mr. Mulanga's political affiliation, the IJ commented that "there is no documentary evidence in the [record] to indicate that the respondent's husband was in fact a member of the UDPS. In addition, there is also no evidence that . . . he was a vocal opponent of the government. . . ." *Id.* at 63. But the IJ failed to explain what corroborating evidence would be reasonably expected, and she failed to provide the applicant with an opportunity to explain its absence. Mrs. Mulanga testified that she was forcibly taken from her home by government agents making it very unlikely that she was able to leave with any documents concerning her husband's UDPS membership. In fact, the IJ may have even discouraged Mrs. Mulanga from presenting such evidence. As previously noted, the IJ requested that counsel present numerous documents in connection with Mulanga's application. The applicant complied with most of the requests or offered an explanation for why the requested documents were not immediately available. At no time, however, did the IJ even hint that she expected documentary evidence of Mr. Mulanga's political affiliation or of his political activities. Thus, while the IJ requested specific documents on some issues, she made no request of Mrs. Mulanga for corroboration of her husband's political affiliation. Instead, the IJ rejected Mulanga's testimony when she failed to produce that corroboration.

It seems all the more unreasonable to require corroboration given that Mulanga had been away from her home for a four-year period before her hearing and she had been in INS detention since her arrival in New York in July 2001. Even assuming that country conditions were considered and the evidence was obtainable, the IJ erred by not alerting Mulanga during the removal proceedings that the absence of corroboration of Mr. Mulanga's UDPS membership would lead to the denial of her application, thereby giving her an opportunity to explain her inability to corroborate.

Next, in regard to Mrs. Mulanga's testimony that her husband was arrested and beaten by government security forces in 1995, and that her husband's mistreatment was politically motivated, the IJ commented that "there is no

evidence to corroborate this assertion. This is nothing but mere conjecture on her part." App. at 64. But in her opinion, the IJ failed to explain why Mulanga's testimony was "mere conjecture" or why it was lacking in credibility. Indeed, if Mulanga provides documentation concerning her husband's political affiliation or a reasonable explanation as to why such documentation cannot be provided, we do not understand what additional documentary evidence Mrs. Mulanga would be required to present to establish that her husband was physically attacked by government agents for his political beliefs. In fact, other than the evidence of general country conditions, which clearly documented numerous acts of political repression, Mrs. Mulanga was in no position to document her story. In this regard, we have previously observed the following:

> It is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum. It is equally obvious that one who flees torture at home will rarely have the foresight or means to do so in a manner that will enhance the chance of prevailing in a subsequent court battle in a foreign land. Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution.

*Senathirajah*, 157 F.3d at 215-16.

In any event, Mrs. Mulanga testified that security agents arrested her husband while he was a member of the UDPS and held him in a government house for two days where they beat him leaving "his face puffed and a lot of scars on his arms." A.R. at 156. She also supplied a letter from her cousin which confirmed that Mulanga had been shot during a demonstration and that security forces were searching for her husband. In these circumstances, the IJ's credibility determination, unless bolstered by an unreasonable failure to provide documentation concerning her husband's political affiliation, cannot be regarded as supported by substantial evidence.

## B.

We believe it necessary to comment on other aspects of this case. Mulanga asserts that the IJ erred by impugning her credibility based on a discrepancy between her airport interview and her testimony at the hearing. She also asserts that the IJ erred by disbelieving her account of her escape from detention with the help of a soldier named Alfonse. Additionally, she asserts that she has established a well-founded fear of persecution if returned to the DRC.

At the airport Mulanga said that she was unaware who shot her, while at the hearing before the IJ, she testified she was shot by one of the Mobutu soldiers. As an initial matter, immaterial discrepancies between airport interviews and subsequent testimony should not be used to make adverse credibility determinations. *See generally Senathirajah v. INS*, ("By placing too much reliance on an airport interview . . . the INS seriously undermined the reliability of the administrative process."). *See also Balasubramanrim v. INS*, 143 F.3d 157, 164 (3d Cir. 1998) (inconsistencies between the airport statement and petitioner's testimony before the immigration judge held to be insufficient to support the BIA's finding that the petitioner was not credible). In any case, the statements are not necessarily inconsistent. Mrs. Mulanga stated at the airport that she did not know who shot her. That is, she did not know the name of the shooter. But, in her testimony, she said it was a Mobutu soldier. These statements, taken together, could mean that Mulanga knew that a Mobutu soldier shot her but she could not identify that soldier by name at the airport interview. In this context, the IJ's use of Mrs. Mulanga's airport statement to impeach her credibility is not supported by the record.

We also agree that the IJ's explanation of her disbelief of the manner in which Mulanga escaped from detention is unsound.[11] The IJ found testimony that Alfonse, a Kabila soldier, helped her to escape "incredulous." A.R. at 64. But the IJ did not articulate a foundation for her disbelief other

---

11. The IJ noted "[t]hat . . . [Mulanga] was just able to, essentially, walk out of her place of detention lacks common sense. This Court questions the ease with [which] she 'escaped.' " A.R. at 64.

than to say that Mulanga's ability to walk away with a government soldier "lacks common sense." *Id.* Mrs. Mulanga did explain at her hearing that Alfonse, a government soldier, had been a friend of her husband's. She further explained that Alfonse spoke to the other soldiers at the detention center and then he walked away with her. If, as the State Department Reports indicate, corruption is rampant in the military, this scenario is plausible.

## C.

An applicant for asylum must provide corroborating evidence only when it would be reasonably expected. In this case, the IJ denied Mrs. Mulanga relief in large part because of the lack of documentary evidence indicating that her husband was a member of the UDPS and that he was a vocal opponent of the government of the DRC. The IJ, however, failed to explain what type of documentation she expected or required. As we have explained, Mulanga was forcibly taken from her home and remained away from her home for the four-year period before her hearing, and she was therefore at a significant disadvantage in obtaining corroboration. Additionally, the fact that the IJ requested, through counsel, that Mulanga present a number of corroborating documents but failed to include a request for documentary evidence of Mr. Mulanga's party membership may have signaled to Mulanga that such corroboration was not needed. In any case, the IJ failed to analyze whether Mulanga had adequately explained why she was unable to present corroborating evidence. The IJ also found petitioner's testimony as to her husband's political activities lacking. The IJ noted "[t]he respondent testified that her husband was a local leader in charge of the young people and 'things like that.' The respondent offered no further activities that her husband was purportedly involved in and [she] was unable to expand on the meaning of 'things like that.'" *Id.* at 63. We note, however, that Mulanga was not asked to elaborate what she meant by "things like that." We also note that, in any event, Mulanga's testimony was more descriptive than the citation to "things like that" suggests. She testified that her husband was the "local person . . .

[and that] [h]is primary function was to work with the young people and to help them function within the party." *Id.* at 154.

We have also explained that Mulanga's airport statement regarding who shot her in 1995 was not inconsistent with her testimony and that the IJ's explanation of her disbelief of Mulanga's testimony concerning her escape from a government house was unsound.

## V. *Conclusion*

Accordingly, we will grant the petition for review, vacate the BIA's order, and remand this case to the BIA for proceedings consistent with this opinion.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*