

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-2006

# Brown v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2024

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Brown v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1282.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1282

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-2024

———

PRINCE BROWN

Petitioner

v.

ALBERTO R. GONZALES,
Attorney General of the United States[*]

Respondent

———

Petition for Review of an Order
of the Board of Immigration Appeals
(No. A79-774-402)
Immigration Judge: Donald Vincent Ferlise

———

Submitted Under Third Circuit LAR 34.1(a)
March 9, 2006

Before: ROTH and ALDISERT, Circuit Judges, and RODRIGUEZ,[**] District Judge

(Filed: April 10, 2006)

———

[*] Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as U.S. Attorney General pursuant to Rule 43(c)(2), Federal Rules of Appellate Procedure.

[**] The Honorable Joseph H. Rodriguez, Senior District Judge, United States District Court for the District of New Jersey, sitting by designation.

## OPINION

ALDISERT, <u>Circuit Judge</u>

Prince Brown, a native and citizen of Ghana, petitions for review of a final order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). For the reasons below, we will deny the petition.

I.

The parties are familiar with the facts and procedural history, so we will only briefly revisit them here. Brown is a 28-year-old native and citizen of Ghana and was born in Cape Coast on December 8, 1976. In 1996, he graduated from a technical school where he had studied air conditioning and refrigeration. He later moved to Sierra Leone, but returned to Cape Coast in or about 1998 when civil unrest in Sierra Leone escalated.

In October 2000, Brown ran into various problems in Cape Coast and moved to his mother's hereditary village of Amoma, Ghana, which is located six or seven hours from Cape Coast by automobile. One day in November 2000, while Brown was in his bedroom with his girlfriend, a group of fetish priests from the Tutuase tribe came into his house

2

and dragged him to the street.[1]  There, they bound his arms and legs and sprinkled his body with a white powder, which Brown testified was the traditional way of anointing a new chief fetish priest.  Brown's uncle had been the village's chief fetish priest and Brown was next in line to succeed him.  Unbeknownst to Brown, his uncle had recently passed away and, in accordance with Tutuase tradition, his death had been kept a secret.

Brown was then carried to a specific location in the bush, where he was to remain alone for seven days without food or water.  If he survived, he would undergo a ceremonial baptism and become the new chief fetish priest.  He was told that in order to become the new chief priest, however, he had to be a "natural" man, which means that he had to be uncircumcised.  If he was "unnatural," i.e., circumcised, he would be killed.  According to Tutuase tradition, he would not be inspected until the baptism ceremony at the end of the seven days.

Brown was in fact circumcised as a child.  He was raised Christian and presently belongs to the Mormon Church.  Before the IJ, Brown testified that he did not want to be a fetish priest, but that he would not be allowed to refuse because it was a hereditary position.  Indeed, Brown testified that if he does not become the new priest and remains alive, the hereditary line will be broken.  The local followers will have to wait ten years,

---

[1] Brown calls these men "religious police," and we will also refer to them by this term. It is important to note, however, that there is no suggestion that these men actually had any government authority.  We interpret the use of the term "police" by Brown to refer to the function and authority of these men within the religion.

sacrifice two cows and prepare the blood of a leopard to start a new lineage for the high priest succession.

While Brown was in the bush, his girlfriend returned to Cape Coast and told his mother what had happened. Brown's mother realized that he would be killed when the other fetish priests discovered that he was circumcised, so she sent his brother to rescue him. On the fifth day of his captivity in the bush, Brown was rescued by his brother and a friend, along with some other men from the village who were enlisted to help.

After his rescue, Brown and his brother moved to Cote d'Ivoire in December 2000, and remained there for five months. They then flew to Mexico, intending to seek asylum in the United States. On June 9, 2001, Brown was apprehended attempting to enter the United States. He was turned over to the San Ysidro Port Enforcement Team and interviewed. He was then re-interviewed on June 13, 2001, and served with a notice to appear on June 20, 2001. On December 12, 2001, Brown filed an application for asylum and withholding of removal.

On July 2, 2003, the IJ issued an order denying Brown's application for asylum, withholding of removal and relief under CAT. The IJ made an adverse credibility finding, citing Brown's untruthful demeanor and inconsistencies between Brown's statements to border authorities and his testimony before the immigration court. The IJ found that Brown had lied in court and filed a frivolous application for asylum. See 8 U.S.C. § 1158(d)(6) (stating that an applicant who files a frivolous application shall be

4

permanently ineligible for relief). The IJ also concluded that Brown's application would fail even if he were found credible because: (1) any persecution he faces upon return to Ghana was not on account of his religion; (2) there is no proof that the government of Ghana is unwilling or unable to protect Brown; and (3) he can avoid the persecution by relocating within Ghana.

Brown subsequently appealed to the BIA. On March 2, 2005, the BIA vacated the IJ's adverse credibility finding and the finding of frivolousness, but nonetheless dismissed the appeal. The BIA found that Brown had failed to demonstrate a well-founded fear of persecution on account of a protected ground, and it expressly agreed with "the [IJ's] determination that the respondent has failed to meet his burden of proof for asylum."

## II.

We have jurisdiction over an appeal from a final order of the BIA affirming a decision of the IJ to deny an alien's asylum application. 8 U.S.C. § 1252(a)(1); see Berishaj v. Ashcroft, 378 F.3d 314, 316 (3d Cir. 2004). Although the BIA agreed with the IJ's decision to deny relief, it did not expressly adopt or defer to the IJ's findings. The BIA instead expressed disagreement with the IJ's adverse credibility finding, but stated in a conclusory fashion that Brown had failed to demonstrate either past persecution or a well-founded fear of future persecution if he were returned to Ghana. In cases such as this – where the BIA merely expresses agreement with the IJ's ultimate disposition, but does not indicate that it is deferring to or relying upon the IJ's findings – the final order

5

we review is the decision of the BIA, not the decision of the IJ. See Voci v. Gonzales, 409 F.3d 607, 612 (3d Cir. 2005).

We review the BIA's factual findings, including its determination of whether an alien has a well-founded fear of future persecution, under the substantial evidence standard. Xie v. Ashcroft, 359 F.3d 239, 246 (3d Cir. 2004). Under that standard, this Court will uphold the findings of the BIA unless the evidence "not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 483-484 (3d Cir. 2001).

The Attorney General has the discretionary power to grant asylum to an alien who qualifies as a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A). See 8 U.S.C. § 1158(b)(1). A refugee is "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A). In order to qualify as persecution for purposes of asylum, the alien must therefore show that: (1) the harm he or she faces is sufficiently severe to qualify as persecution; (2) it is "on account of" one of the statutorily-enumerated grounds; and (3) it is "committed either by the government or by forces that the government is either unable or unwilling to control." See Mulanga v. Ashcroft, 349 F.3d 123, 132 (3d Cir. 2003). The alien bears the burden

6

of proving eligibility for asylum. 8 C.F.R. § 208.13(a).

The threshold for establishing eligibility for withholding of removal and eligibility under CAT is even higher than that for establishing entitlement to asylum. See Senathirajah v. INS, 157 F.3d 210, 215 (3d Cir. 1998); Wang v. Ashcroft, 368 F.3d 347, 349 (3d Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)).

III.

As noted above, to establish eligibility for asylum, Brown must demonstrate that the persecution he faces will be "committed either by the government or by forces that the government is either unable or unwilling to control." Mulanga, 349 F.3d at 132; see also Abdille, 242 F.3d at 494. Where violence is "primarily wrought by fellow citizens" rather than "government action or acquiescence," an application for asylum will be denied. Lie v. Ashcroft, 396 F.3d 530, 537-538 (3d Cir. 2003).

Here, the evidence presented simply does not compel the conclusion that the Ghanian government is unable or unwilling to protect Brown from the Tutuase "religious police." We have examined the entire record and we can only find two instances where Brown asserted that the government of Ghana was unable or unwilling to protect him. First, in his application for asylum and withholding of removal he states:

> The government of Ghana will not intervene on my behalf. We are talking about a tribal religious matter, and the custom in Ghana is that each tribe is independent as to its handling of its religious beliefs. Even if it results in the death of a member for violation of it, the government will not intercede on a citizen's behalf. (App. At 285.)

7

Second, during the June 13, 2001 credible fear interview Brown was asked whether the Ghanian authorities can help him. His response was: "No, they do not get involved in these matters. They would not be able to protect me because they would respect the traditions and laws of this religion." (App. at 185.)

We are not persuaded that these two bald assertions, neither of which were a part of Brown's testimony before the IJ, are sufficient to establish the requisite governmental nexus. Brown never testified or suggested that he sought protection of the government or that such protection was not afforded him when it was sought. He has not referred us to any country reports, newspaper articles or other objective evidence indicating that the Ghanian government's deference to traditional religious practices is so great that it would not intervene on his behalf to prevent Tutuase "religious police" from abducting and ultimately murdering him. Indeed, the objective evidence in the record is to the contrary.[2]

---

[2] For example, the Department of State's Country Report on Human Rights Practices in Ghana for 2002 states that Ghanian law prohibits involuntary servitude and that government agencies have campaigned actively against Trokosi, which is a traditional form of religious servitude where young women are forced to serve fetish priests for up to three years. The Department of State's Country Report on Human Rights Practices in Ghana for 2001 also recounts an incident in 2000 where the government forcibly immunized children at an Apostolic Faith of Kpalexose church against polio even though their faith forbids the use of orthodox medicine. These instances of government intervention undermine Brown's contention that the Ghanian government refuses to interfere in traditional religious affairs. Moreover, even if we were to assume that the Ghanian government would be hesitant to intervene in the religious affairs of the rural village of Amoma, there is no evidence that the Ghanian government would show the same indifference if Tutuase "religious police" came to the relatively metropolitan city of Cape Coast, which is six or seven hours by car from Amoma, to abduct and potentially murder Brown. Cf. 8 C.F.R. § 208.16(b)(1)(i)(B) (providing that a presumption of future

8

We therefore find that the BIA's decision denying asylum is supported by substantial evidence. For largely the same reasons, we also find that substantial evidence supports the BIA's denial of withholding of removal and protection under CAT.

IV.

Having concluded that Brown failed to establish the requisite governmental nexus, we will not address the Government's argument that Brown was not persecuted "on account of" one of the statutorily-enumerated factors. We have considered all the contentions presented by the parties and conclude that no further discussion is necessary. The petition for review will be denied.

_____

persecution may be rebutted if the Government shows that the applicant could avoid future harm by relocating to a different part of the country).