

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-7-2006

# Tesfaye v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1933

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Tesfaye v. Atty Gen USA" (2006). *2006 Decisions.* Paper 946.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/946

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1933

AMAN TESFAYE,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES;
SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY,
Respondents

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A96-204-225

Submitted Under Third Circuit LAR 34.1(a)
March 30, 2006

Before: McKEE, BARRY and VAN ANTWERPEN, Circuit Judges

(Opinion Filed: June 7, 2006)

OPINION

BARRY, Circuit Judge

Aman Tesfaye petitions for review of a final order of the Board of Immigration

Appeals affirming the Immigration Judge's denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture. We will deny the petition.

## I.

Tesfaye is a native and citizen of Ethiopia of Oromo ethnicity. In his I-589 application, and in his testimony before the Immigration Judge ("IJ"), Tesfaye claimed as follows. In September of 2002, his father was arrested on suspicion of being a member of the Oromo Liberation Front ("OLF"), a "banned political party." A week later, Tesfaye himself was arrested, along with many other young Oromo men, on suspicion of being involved in the deadly bombing of a hotel in Addis Ababa.[1] Tesfaye was detained for approximately one week, during which time he was housed with sixteen other prisoners in a "crowded filthy [cell] not fit for humans." Over the course of the week, he was repeatedly taken to "the torture chambers" and beaten. He was released after his uncle paid the police "a large sum of money," and his mother posted bail. Tesfaye was told to check in with the authorities once a month.

Following his release, Tesfaye's uncle—who felt it was unsafe for Tesfaye to remain in Ethiopia—contacted a smuggler and arranged for Tesfaye to be transported to the United Kingdom. Tesfaye paid a final visit to his father, who remained in prison, and

---

[1] Officials suspected the OLF of carrying out the bombing. The OLF denied responsibility.

then fled. When Tesfaye failed to report to the police for his monthly check-in, the police arrested his mother. She was detained for three weeks, during which time she was beaten and raped by the police. "After a long bout dealing with the psychological and physical trauma she sustained, she finally passed away on July 1, 2003." (App. at 492.)

Meanwhile, Tesfaye, who had arrived in the United Kingdom, turned himself in to British authorities and applied for asylum. His asylum application was denied. Tesfaye was "devastated" and frightened by the denial. Rather than return to Ethiopia, he purchased a fake British passport and flew to the United States. Tesfaye arrived at Philadelphia International Airport on December 9, 2003, and attempted to enter the United States using his fake passport. Officials detected the forgery and denied Tesfaye admission. Tesfaye requested political asylum, and his application was referred to an Immigration Judge ("IJ"). At his hearing before the IJ, Tesfaye applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

Following the hearing, the IJ issued an oral decision denying Tesfaye's application for relief. Although the decision is somewhat unclear, the IJ seems to have based her conclusion that Tesfaye was ineligible for relief on several findings. First, she found that Tesfaye did "not me[et] his burden of establishing eligibility for the relief he seeks: asylum, withholding, or protection under CAT," because he "failed to provide corroborating evidence that is reasonably expected." (App. at 63.) Additionally, although the IJ did not make an explicit adverse credibility finding, she expressed doubts about

3

elements of Tesfaye's testimony.  Finally, she indicated that she did not believe that Tesfaye's arrest and interrogation were sufficiently severe to constitute persecution.[2]  The Board of Immigration Appeals ("BIA") affirmed without opinion.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a) to review final orders of removal.  Where, as here, the BIA affirms an order of removal without a substantive opinion, we review the IJ's decision.  *See Dia v. Ashcroft*, 353 F.3d 228, 245 (3d Cir. 2003) (en banc).  We review the IJ's findings of fact and credibility determinations under a substantial evidence standard.  *See, e.g.*, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).  In so doing, we ask whether such determinations are "supported by evidence that a reasonable mind would find adequate."  *Dia*, 353 F.3d at 249.  We may reverse only if a "reasonable adjudicator would be compelled to conclude to the contrary."  *See Shardar v. Ashcroft*, 382 F.3d 318,

---

[2] Although, again, the IJ did not make an explicit finding that there was no past persecution, she made numerous statements to that effect.  For example:

> The reports indicate that there were several young Oromo arrested as was the respondent, according to his story.  However, it is noted that the respondent was released after questioning.  The government has a right to question people in connection with a bombing that kills people.  That's pretty clear.  Even the United States will arrest and pick people up for questioning after violent activity.  He was subsequently released.

(App. at 61; *see also* App. at 62 ("While we may not find that Ethiopia has the same protection of arrested individuals as we have in this country, nonetheless he was arrested, he was interrogated, and he was released.  There is nothing to indicate that he could not have remained in his country . . . .").)

4

323 (3d Cir. 2004); *see also Elias-Zacarias*, 502 U.S. at 481 n.1 ("To reverse the BIA

finding we must find that the evidence not only supports that conclusion, but *compels* it

. . . .").

### III.

As an initial matter, we reiterate that the IJ did not make an explicit adverse

credibility finding and did not identify any inconsistencies in Tesfaye's testimony. She

merely indicated doubts about some aspects of Tesfaye's story. For example, she stated:

> On September 20th the respondent went and visited his father in prison and
> then finally left Ethiopia on September 28th. The respondent has indicated
> that he had to leave Ethiopia, yet he could go and visit his father in prison
> the day after he was released. If he was trying to avoid authorities, this
> surely was not a way to do so.

(App. at 17.)

Mere expressions of doubt, however, do not constitute an explicit adverse

credibility finding.[3] We have several times affirmed the rule that in the absence of an

explicit adverse credibility finding, we must proceed as if the applicant's testimony were

credible, and determine whether the IJ's decision is supported by substantial evidence.[4]

---

[3] The Government does not contend that the IJ made an adverse credibility finding.
*See* Appellee's Br. at 19 n.7 ("In his brief to this Court, Tesfaye characterizes the [IJ's]
decision as an adverse credibility determination. To the contrary, the [IJ] based her
decision on the ground that Tesfaye failed to meet his burden of proof.") (internal
citations omitted).

[4] Congress codified this rule in the REAL ID Act of 2005, which states that "if no
adverse credibility determination is explicitly made, the applicant or witness shall have a
rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii). This
provision applies only to asylum applications filed after May 11, 2005, and does not apply

*See Toure v. Attorney General*, No. 05-1746, 2006 U.S. App. LEXIS 8239, at *39-*40 (3d Cir. April 5, 2006); *Lusingo v. Gonzales*, 420 F.3d 193, 197 n.5 (3d Cir. 2005); *Li v. Attorney General*, 400 F.3d 157, 163-164 (3d Cir. 2005); *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003). Accordingly, we will presume the credibility of Tesfaye's testimony and proceed to evaluate the IJ's conclusion that Tesfaye failed to meet his burden of establishing eligibility because he failed to provide reasonable corroboration.

An applicant's burden of proof may be satisfied solely by his or her credible but uncorroborated testimony; however, "otherwise-credible applicants may be required, under certain circumstances, to provide corroborating evidence in order to meet their burden of proof."[5] *Mulanga v. Ashcroft*, 349 F.3d 123, 133-34 (3d Cir. 2004) (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001)). "[T]he absence of corroboration or explanation in cases where it is reasonable to expect one or the other can lead to a finding that the applicant has failed to meet his burden of proof." *Abdulai*, 239 F.3d at 546-47. Before denying relief on this ground, an IJ must: (1) identify facts for which "it

to Tesfaye's application.

[5] "[C]orroboration and credibility, although intuitively related, are distinct concepts that should be analyzed independently." *Toure*, 2006 U.S. App. LEXIS 8239, at *31; *see also Xia Yue Chen v. Gonzales*, 434 F.3d 212, 221 (3d Cir. 2005):

> It might seem intuitive that a lack of corroboration could cast doubt on the veracity of a witness's testimony, even a witness whose story was delivered with an appealing demeanor, internally consistent, and not inherently improbable. Indeed, such a characterization might well describe the pitch of a flimflam man. However, it is clear that the BIA's own rule requires a credibility determination to be independent of an analysis of the sufficiency of an applicant's evidence.

is reasonable to expect corroboration"; (2) determine whether the applicant has presented corroborating evidence; and if not, (3) determine whether the "applicant has adequately explained why s/he was unable to do so." *Id.* at 554; *see also Mulanga*, 349 F.3d at 134 n.9. We have repeatedly held that if the IJ (or BIA) fails to conduct this three-part inquiry, the finding regarding lack of required corroboration must be vacated and the matter remanded. *See Abdulai*, 239 F.3d at 555; *Mulanga*, 349 F.3d at 136.[6]

Here, the IJ faulted Tesfaye for failing to provide: (1) a letter from his uncle, or another family member in Addis Ababa, verifying his account of events; and (2) copies of his application for asylum in the United Kingdom, the denial letter, and the denial of his

---

[6] The scope of our review over an IJ's corroboration determination was also addressed by Congress in the Real ID Act, which provides that "[no] court shall reverse a determination made by the trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." § 101(e), Pub.L. No. 109-13, 119 Stat. 231, 305, to be codified at 8 U.S.C. § 1252(b)(4)(D). This provision was effective upon passage of the Real ID Act on May 11, 2005, and applies to any case "in which the final administrative removal order is or was issued before, on, or after such date." *Id.* § 101(h)(3), 119 Stat. at 305-306; s*ee Chen v. Gonzales*, 434 F.3d 212, 218 (3d Cir. 2005). Accordingly, this standard of review applies in this case. As we recently explained, however:

> We do not interpret 8 U.S.C. § 1252(b)(4)(D) to alter our rules that (1) an IJ has a duty to develop an applicant's testimony, especially regarding an issue that she may find dispositive, and (2) as a logical predicate to appellate review, the BIA must adequately explain the reasons for its decisions. Indeed, it is impossible for us to determine whether "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable," 8 U.S.C. § 1252(b)(4)(D), unless a petitioner is given the opportunity to testify as to its availability.

*Toure*, 2006 U.S. App. LEXIS 8239, at *37-*38 (alteration in original, internal citations omitted).

appeal. With respect to (1), the IJ did not engage in the requisite inquiry described above.

> [S]he never gave [Tesfaye] the opportunity to provide an explanation for its absence or to seek supporting evidence from his relatives in [Addis Ababa]. It was not until the oral decision that the IJ indicated that she expected such evidence. Accordingly, [Tesfaye] was not provided with notice and an opportunity to present an explanation.

*Id.* at \*34. With respect to (2), however, the IJ reasonably concluded—after giving Tesfaye ample notice and opportunity to explain—that he should have provided copies of the British asylum documentation. The IJ repeatedly asked Tesfaye to produce these documents, or alternatively to sign a release to enable the government to obtain them. He refused, arguing that the documents were irrelevant, and that he was under no obligation to produce them or aid in procuring them.[7] The IJ disagreed.

The documents are certainly relevant to Tesfaye's application for asylum in the United States. If the information he provided in the British asylum application is consistent with the information he provided here, the documents would corroborate his story. If, on the other hand, there are discrepancies between the allegations in the two petitions, the documents would undermine his credibility. Either way, they would be relevant to his application and would have been helpful to the IJ. Because the IJ

---

[7] Tesfaye's counsel submitted the affidavit of his legal assistant explaining the efforts she undertook to obtain the documents: she tried calling the Immigration and Nationality Directorate branch of the United Kingdom Home Office twice (without success), and sent one email. Although counsel initially argued that his office had "spent an enormous amount of effort" attempting to obtain the documents, he soon abandoned that argument and began arguing that he did not have to—and would not—obtain the documents.

conducted the required inquiry, and reasonably concluded that Tesfaye failed to offer an adequate reason for failing to produce documents which he did not argue were unavailable, we will uphold her decision that Tesfaye failed to meet his burden of proof.[8]

## IV.

For the foregoing reasons, we will deny the petition for review.

---

[8] Because we find that the IJ's decision must be upheld based on her corroboration determination, we need not address her implicit conclusion that Tesfaye's arrest and interrogation were not sufficiently severe to constitute persecution. We note, however, that while governments certainly have "a right to question people in connection with a bombing that kills people," (App. at 61), Tesfaye's allegations go beyond simply being questioned in the aftermath of a violent attack. He claims that he and his father were arrested based solely on their ethnicity, that he was severely beaten, and that his mother was beaten and raped.