

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-15-2003

# Awolesi v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-2435P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Awolesi v. Atty Gen USA" (2003). *2003 Decisions.* Paper 290.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/290

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 15, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2435

JOSEPH AWOLESI and
EBENEZER AWOLESI,
Petitioners

v.

JOHN ASHCROFT, Attorney General of
the United States,
Respondent

On Petition for Review of an Order of
the Board of Immigration Appeals
(INS Nos. A73-034-576, A73-034-577)

Argued January 21, 2003

Before: BECKER, *Chief Judge*,* NYGAARD and
AMBRO, *Circuit Judges.*

(Filed: August 15, 2003)

JEFFREY A. HELLER (ARGUED)
8 Hampton Street
Cranford, NJ 07016

*Counsel for Petitioners*

_____

* Judge Becker completed his term as Chief Judge on May 4, 2003.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General,
 Civil Division
CARL H. MCINTYRE, JR.
Senior Litigation Counsel
DAVID E. DAUENHEIMER
 (ARGUED)
Office of Immigration Litigation
U.S. Department of Justice,
 Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

*Counsel for Respondent*

---

## OPINION OF THE COURT

BECKER, *Circuit Judge.*

This is a petition for review of an extremely terse (four sentence) order by the Board of Immigration Appeals ("BIA"), reversing the decision of the Immigration Judge ("IJ") granting the applications for asylum of petitioners, Joseph Awolesi ("Awolesi"), and his son Ebenezer (whose claim is derivative of Joseph's). Awolesi testified before the IJ that his brother, Matthew Awolesi ("Matthew"), a member of the pro-democracy party in Nigeria and an elected member of the local community council, was the target of ambush and assassination attempts by the security forces of the ruling party in Nigeria and is now in hiding. Awolesi, who used the proceeds from his successful pharmaceutical company in Nigeria to fund Matthew's political career, argues that if returned to Nigeria, he would be persecuted by the government, which believes that he is a member of the pro-democracy party (based on Matthew's association with the party). On the basis of the evidence supporting these claims, the IJ concluded that Awolesi and Ebenezer had shown a well-founded fear of persecution on account of imputed political opinion.

While we give deference to the decisions of the BIA, and must affirm its findings unless the evidence "compels" a

contrary conclusion, we cannot give meaningful review to a decision in which the BIA does not explain how it came to its conclusion. This is not a case in which the BIA affirmed the decision of the IJ without explanation, in which case we might scour the record for supporting evidence. Here, instead, the BIA reversed the decision of the IJ, with only the opaque explanation that "the evidence is insufficient" and "the arguments made by the [INS] on appeal . . . are persua[sive]." As a result, we cannot tell whether the BIA was making a legal decision that Awolesi was statutorily ineligible for asylum or whether it found Awolesi's story incredible. In these circumstances, we conclude that we cannot perform meaningful review of the BIA's order, hence we will vacate the order of deportation and remand for further consideration.[1]

## I.

Awolesi and Ebenezer are citizens and natives of Nigeria.[2] They arrived in the United States in February of 1993 carrying valid "visitor for pleasure" visas which authorized them to remain until August of 1993. In October of 1993, Awolesi applied for asylum and withholding of deportation. In the original application, Awolesi claimed that he was subject to persecution by the Muslim fundamentalist police on account of his Christian religion. Awolesi's application for asylum was denied by the INS and he and Ebenezer

---

1. We note that the recently enacted Streamlining Regulations, 8 C.F.R. § 3.1(a)(7), which allow the BIA to *affirm* summarily the decision of the IJ without adopting its reasoning, are not applicable to this case.

2. We will use the singular, Awolesi, to refer to the claims of both petitioners since Ebenezer's claims are essentially derivative of his father's. Awolesi fears that the Nigerian government may kidnap Ebenezer as a means of coercion. This concern is supported by a 1996 State Department Report which states that "[t]he [Nigerian] regime repeatedly engaged in arbitrary arrest and detention. . . . Police also commonly place relatives and friends of wanted suspects in detention without criminal charge in an effort to induce suspects to surrender to arrest." Awolesi's original application for asylum included Ebenezer; in November of 1996, Ebenezer filed a separate application after turning 21 years old.

were issued orders to show cause charging them as deportable for having overstayed their visitor visas.

Awolesi appeared before the IJ and claimed that he would be persecuted if returned to Nigeria because the government believed that he was a member of the pro-democracy party. Awolesi asserted that he was the owner of a successful pharmaceutical company in Nigeria and that the business had made approximately $90,000 a year from 1988 to 1991 and approximately $60,000 a year after that. Awolesi claimed that he used some of the proceeds from that business to support his brother Matthew's political career. Awolesi claims that Matthew had paid to send Awolesi to college to get a bachelor's degree and Awolesi wanted to return the favor. Awolesi represented that Matthew worked for the Nigerian government until 1984, when he was fired from his position for making outspoken political statements about the military regime that ran the country. Awolesi contends that Matthew was a member of the Social Democratic Party, a pro-democracy party in Nigeria, and, with Awolesi's financial backing, was elected to the position of "chair person" of one of the local community councils, governing an area with a population of approximately 200,000 people. Awolesi stated that he also joined the Social Democratic Party, but that he was not as politically active as his brother.

Awolesi claims that his brother, because of his political activity, became a target of the ruling party of Nigeria. He maintains that Matthew was ambushed in his home in 1991. Later, in 1992, Awolesi asserts, shots were fired at Matthew's official car and one of his aides was seriously injured.[3] Awolesi contends that Matthew subsequently went into hiding for fear of persecution by the Nigerian government. Awolesi also represents that he was threatened by members of the military and that he was told by a "friendly government agent" that the military regime had discussed killing him.

---

3. Awolesi provided a copy of an article from a local newspaper documenting this incident. As the INS notes, however, this article suggests that the attack was not politically motivated but was rather an attempt to steal the vehicle.

Awolesi states that he fled the country in 1993 because he was worried about the outcome of the upcoming elections: he feared that the government would lash out against individuals that were believed to support the pro-democracy party.[4] Awolesi took his then teenage son Ebenezer with him, but left behind his wife and other children (none of whom have been harmed in his absence). Awolesi believes that he may be on a government "black list" and would be arrested and tortured or killed if he is returned to Nigeria.

The IJ conducted a full hearing on the merits, at the end of which he granted asylum to Awolesi and his son based on a showing of a well-founded fear of persecution on account of imputed political opinion.[5] In support of the grant of asylum, the IJ reasoned as follows:

> The current report on human rights practices relating to Nigeria clearly indicates that there are substantial problems that exist in Nigeria at the present time of a political nature. In the submissions made by the Respondent, he has clearly presented documentation to show that his brother was an individual who was politically involved in his country, and clearly that his brother could have been and might have been a target of political activist[s] who are against his political opinions in his country. It is also clear, that often in countries like Nigeria, one of the means of attacking the political leaders is to attack certain members of their families, and clearly, financial supporters of such political leaders, especially if they are family members, would be persons who could be subject to political and physical harm.

> One of the points raised by the Government Trial Attorney is important to consider in this case, and that is, the rest of the Respondent's family and the person who he refers to as his brother, who is a political activist, all are still in Nigeria and apparently no harm

---

4. The pro-democracy forces won the 1993 election, but a coup d'etat followed, returning to power the individuals who had lost the election.

5. The IJ rejected the claim of religious persecution.

has come to them. In regard to the brother, there can be possibly a number of explanation[s] as to that. One, that in hiding he has been successful in eluding the government authorities. A second possibility is that even if he has been unsuccessful and the authorities do know where he is . . . it may very well be that because his brother is a prominent individual, that the authorities chose not to do anything to his brother until such time that they believe his brother may pose an immediate threat to them. On the other hand, what about individuals who occupy less important positions in Nigerian society, such as a brother like the Respondent, who is not politically active. The action by the government against such individuals would be little moment to the general population. . . . any harm to such persons would cause minimal disruption in the society.

. . .

In looking at the *Country Reports on Human Rights Practices* relating to Nigeria [for 1997], it is important to note that even the State Department recognizes the difficulties existing in Nigeria at this time. . . . "that the government continued to enforce its arbitrary authority throughout the federal security system. The military, the security forces services and the national police have through decree, decreed blocking action by the opposition in the court. All branches of these security forces committed serious human rights abuses."

The INS appealed the decision of the IJ to the BIA.[6] The

---

6. Awolesi contends that the BIA violated its own regulations by accepting the INS's appeal. While the INS submitted its brief to the BIA by the required date, February 2, 1998, it did not serve Awolesi's counsel with a copy of the brief by this date (Awolesi provides a copy of the postmark which indicates that service was untimely). The INS nonetheless attested to the BIA that it had served opposing counsel by February 2, as the BIA requires that briefs be filed with proof of service on the other party. Awolesi contends that this amounted to fraud on the part of the INS and that the BIA should not have accepted the appeal because it was improperly filed. The INS responds that the BIA has discretion to accept such appeals and that while this discretion is limited

BIA reversed the decision of the IJ, with the following terse explanation:

> The appeal is sustained. We have considered the arguments made by the [INS] on appeal and are persuaded. The evidence is insufficient to show that the respondents were persecuted on account of an imputed political opinion or that they would now face persecution because of a protected ground. Accordingly, the appeal is sustained.

We have jurisdiction pursuant to former INA § 106, 8 U.S.C. § 1105(a). We review factual determinations of the BIA under the substantial evidence standard. *See Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001) ("Under the substantial evidence standard, the BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it."). We review the decision of the BIA, not that of the IJ. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001).

## II.

Awolesi contends that we should vacate the BIA's decision because its four-sentence order "is so conclusory and deficient that it leaves nothing for this court to review."[7] Awolesi finds support for this argument in our opinion in

---

by due process considerations, they are pertinent only if the applicant has shown that he was prejudiced, which Awolesi has not. We agree. While it does not affect the outcome, it appears that the INS acted in an unprofessional manner by making a false representation that it had served a copy of the brief on a certain day, and we reprove it for doing so. That said, the BIA did not err by accepting the brief because the BIA's own rules give it discretion to accept such briefs. At all events, it does not appear that Awolesi has alleged that the BIA's acceptance of the brief amounted to a due process violation since he has not demonstrated that he was prejudiced by the misrepresentation.

7. Awolesi also asserts that the BIA violated his due process rights with its terse opinion. However, "the question for due process purposes . . . is simply whether the Board made an individualized determination." *Abdulai*, 239 F.3d at 550. We are satisfied that the BIA considered Awolesi's individual case.

*Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001). *Abdulai* involved a decision by the BIA, affirming the IJ, which had denied the applicant's application for asylum and withholding of deportation. The BIA's decision contained only the following analysis:

> We acknowledge that the respondent has submitted numerous articles and reports regarding general country conditions in Nigeria. However, we note the conspicuous lack of documentary evidence corroborating the specifics of the respondent's testimony.

*Id.* at 547.

We concluded that the BIA had not sufficiently explained why it affirmed the decision of the IJ, noting:

> What the BIA never explains, however, is what *particular* aspects of Abdulai's [the applicant's] testimony it would have been reasonable to expect him to have corroborated. Without knowing that, it is impossible for us to review: (1) whether it was reasonable to expect Abdulai to corroborate such information; (2) whether Abdulai provided the requisite corroboration; or (3) whether Abdulai adequately explained his inability to do so.

*Id.* at 554 (emphasis in original).

Earlier, in *Sotto v. INS*, 748 F.2d 832, 836 (3d Cir. 1984), we determined that we could not give meaningful review to the decision of the BIA affirming the IJ where the BIA did not explain why it discredited the sworn affidavit of the applicant, noting only that he had "not submitted substantial, probative evidence to corroborate his fear." We wrote:

> We recognize that there is a possibility that the [IJ] or the Board choose to discredit the [applicant's] affidavit for reasons that are within their expertise. However, if they do not articulate such reasons, we are unable to discharge our statutory obligation of review. To determine whether the administrative action was arbitrary, the courts must be apprised why evidence, relevant and persuasive on its face, was discredited.

> We must also review the decisions of administrative agencies to ascertain whether the proceedings were conducted with regularity, including whether the agency considered the relevant evidence.

*Id.* at 837. *See also Tipu v. INS*, 20 F.3d 580, 586 (3d Cir. 1994) ("[T]he Board failed to consider one of the factors in Tipu's favor, a practice which in *Sotto v. INS* resulted in a remand for reconsideration."); *Bastidas v. INS*, 609 F.2d 101, 105 (3d Cir. 1979) (holding that the decision of the BIA "will not be affirmed by this court unless the reasons for such a finding are made clear").

Likewise, in the case at bar, we are given no indication why the BIA denied Awolesi's petition and we cannot determine whether it acted arbitrarily. Indeed, in *Abdulai* and *Sotto*, the BIA at least stated that it discredited the applicants' accounts without explaining why or what aspects of the accounts it found unbelievable. Here, the BIA has not even told us that it discredited Awolesi's testimony; we do not know whether the BIA was making a legal determination that Awolesi could not qualify under the statute, even assuming his story was true, or whether it found that Awolesi's testimony was inconsistent. We do not know what is meant by the BIA's statement that "[t]he evidence is insufficient to show that the respondents were persecuted on account of an imputed political opinion." This could indicate that the evidence was legally insufficient or that the BIA found Awolesi's testimony incredible.

In order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning. For example, the BIA might explain that it did not believe Awolesi would be tortured or killed if returned to Nigeria because his wife and other children have not been harmed in his absence. Or that it did not find Awolesi's account credible because his initial application for asylum listed only his claim that he feared persecution if returned to Nigeria on account of his religion. The BIA would then have to explain why it found the IJ's reliance on the *Country Reports* and the news article documenting the attack on Matthew Awolesi's car unpersuasive. The BIA's decision may have been supported by substantial evidence, and there may not be evidence to compel the opposite

conclusion. However, we simply do not know what evidence the BIA used to come to its decision.

Most importantly, we are particularly concerned about being able to give meaningful review to the BIA's decision where the BIA *reverses* the IJ without explanation. *Abdulai* and *Sotto* involved decisions by the BIA affirming the IJ without explaining why the applicants' accounts were unbelievable or what corroborative evidence they could have offered. This Court, sitting in banc, has before it (*sub judice*) the case of *Dia v. Ashcroft*, No. 02-2460 (3d Cir. argued in banc May 28, 2003), in which the issue is whether the recently promulgated Streamlining Regulations, 8 C.F.R. § 3.1(a)(7), allowing a single member of the BIA to affirm the *result* of the IJ's decision and order without adopting its *reasoning*, violate fundamental principles of administrative law or due process. If we uphold the Streamlining Regulations, BIA decisions like those at issue in *Abdulai* and *Sotto* would likely be affirmed so long as the BIA acted pursuant to the Streamlining Regulations.[8] However, the Attorney General has explained that the Streamlining Regulations do not apply to summary reversals by the BIA, noting, "A reversal or remand will necessarily require some explanation, while an affirmance without opinion leaves the decision below as the final agency decision." Executive Office for Immigration Review; Board of Immigration Appeals: Streamlining, 64 Fed. Reg. 56,135, 56,140 (October 18, 1999) (to be codified at 8 C.F.R. pt. 3). Thus, our holdings in *Abdulai* and *Sotto* (as well as a number of other opinions applying those opinions), that the BIA must explain why it reversed the decision of the IJ, will continue to be good law in cases occurring after the promulgation of the Streamlining Regulations, regardless of our decision in *Dia*.

## III.

For the foregoing reasons, we will grant the petition for review, set aside the BIA's final decision and order of

---

8. The Streamlining Regulations were promulgated on October 18, 1999.

deportation, and remand for further consideration, consistent with this opinion.[9]

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

9. Awolesi contends that the facts are so convincing that we should reverse outright the decision of the BIA and grant his petition for asylum. However, the Supreme Court held in *INS v. Ventura*, 537 U.S. 12 (2002), that courts of appeals cannot decide de novo issues that the BIA failed to consider.