

[2004 Decisions]

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2004

# Senoga v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Senoga v. Atty Gen USA" (2004). *2004 Decisions.* Paper 988.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/988

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-1014

———————

DANIEL WALUSIMBI SENOGA,
Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States,
Respondent

———————

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS
Agency No. A76-118-595

———————

Submitted Under Third Circuit LAR 34.1(a)
January 8, 2004

———————

Before: BARRY, SMITH, <u>Circuit Judges</u>, and POLLAK,[*] <u>District Judge</u>

———————

(Opinion Filed:  February 23, 2004 )

———————

OPINION

———————

———————

[*] The Honorable Louis H. Pollak, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

BARRY, Circuit Judge

We are asked to review the decision of an Immigration Judge ("IJ") to deny petitioner Daniel Walusimbi Senoga's application for asylum and withholding of removal, and the Board of Immigration Appeals' ("BIA") subsequent decision to adopt and affirm, without opinion, the IJ's decision. We find that the IJ's adverse credibility determination is not supported by substantial evidence, and will remand to the BIA for further proceedings in accordance with this opinion.

## I.

Senoga is a native of Uganda, born there on May 17, 1975. His father was a wealthy landowner affiliated with the Uganda's People's Congress ("UPC"), a political organization opposed to the ruling party in Uganda.[1] In 1986, when Senoga was a child and away at boarding school, soldiers came to his father's house, accused his father of plotting to overthrow the government, beat him, cut off his ear, and took him away, never to be heard from again. Thereafter, two of Senoga's siblings left Uganda for the United States and Canada; both returned to Uganda briefly, but left soon thereafter when harassed by the government.[2] Senoga's three other brothers remain in Uganda: two are

---

[1]The extent of Senoga's father's affiliation with the UPC remains unclear. Senoga's sister, Penina, testified that their father contributed money to the UPC. Senoga's brother, Nathan, testified that their father was a "chief supporter" and a member of the UPC, but never held any official post.

[2]In late 1989, Penina left Uganda and went to Canada. She returned to Uganda in 1991 and hired an investigator to try to find out what had become of her father. The investigator was arrested, Penina was interrogated by soldiers, and she returned to

2

believed to be in jail, and the other, Senoga's half-brother, is a child living with other relatives. Senoga's mother remains in Uganda because the government has taken away her travel documents.

On December 20, 1997, soldiers returned to Senoga's home looking for guns, and interrogated him about rebel meetings. They kicked him in the groin, slapped him, and arrested him and two of his brothers as suspected rebel collaborators. While detained, Senoga claims that soldiers beat him, shocked him with electrical devices attached to his hands,[3] grasped and hurt his genitals with pliers, sodomized him with a rod, stabbed him in the leg, and made him sleep on a concrete floor with no mattress or blanket. They questioned him repeatedly, and asked him to identify individuals who allegedly attended meetings in his house, none of whom he could identify.

Senoga does not know for how long he was detained, but was told it was three to four months. In April 1998, he was put on a bus to be transferred to another location. While en route, Senoga claims he heard a loud explosion at the back of the bus, which caused it to overturn. He lost consciousness, and when he came to, found himself in the bus, which was off the road and in a wooded area. He climbed through a window, and

Canada, coming to the United States in 1994. Nathan came to the United States in 1990. He returned to Uganda in 1992 and attempted to sue the government for confiscating his family's property, but left shortly thereafter when the government harassed and threatened him and his lawyer.

[3]The parties state in their briefs, and the IJ stated in his decision, that the wires were attached to Senoga's genitals. Senoga testified, however, that they were attached to his hands.

had no idea whether anyone else on the bus, including the two armed guards, three other prisoners, and driver, was dead or alive. He walked for about a day until he came to a barn, where he found clothes and slept. He then continued to walk until he came to Uanamagambo, where an acquaintance, the Reverend Wamala, lived. Reverend Wamala took Senoga in, and drove him to Wamala's parents' house, some 80 miles away, to keep him out of sight.

Mrs. Wamala nursed Senoga back to health, and Wamala obtained a visa for Senoga to come to the United States. Senoga arrived in the United States on December 1, 1998. He claims that Wamala paid $1,000 for his plane ticket, but he has no plans to repay him and has not contacted him for fear that Wamala's phone might be tapped. Senoga's brother, Nathan, claims that he made the arrangements for Senoga's visa, and that he paid for the plane ticket, but did not tell Senoga that he had done so.

On December 30, 1998, Senoga applied for asylum and withholding of removal, recounting his arrest, torture, and escape, and his fear that he would be arrested and detained if he returned to Uganda. On April 13, 1999, the asylum officer who completed Senoga's Assessment to Refer found him to be not credible. On April 20, 1999, the Immigration and Naturalization Service ("INS") issued a Notice to Appear, charging that Senoga was removable, pursuant to 8 U.S.C. § 1227(a)(1)(B), for remaining in the United

4

States, without authorization, beyond the expiration of his temporary visa.[4]

Senoga conceded removability, but renewed his application for asylum and withholding of removal. After a hearing, the IJ, on December 20, 1999, denied his application, accepting part of Senoga's story and discrediting part of it. Senoga appealed to the BIA, which, on December 3, 2002, adopted, without opinion, the IJ's decision. Senoga argues to us that the BIA's application of the streamlining rule was inappropriate, and that the IJ's adverse credibility determination was not based on substantial evidence. We have jurisdiction to review the final order of removal, 8 U.S.C. § 1252(a); in this case, we review the IJ's decision.[5] See Mulanga v. Ashcroft, 349 F.3d 123, 131 (3d Cir. 2003).

## II.

The Attorney General may, pursuant to 8 U.S.C. § 1158(a) & (b)(1), grant asylum to an alien if he determines that the alien is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A), which defines a refugee as "any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of

---

[4]There is some confusion as to this expiration date. The visa itself states that it expires on November 18, 1999. The Notice to Appear states that Senoga was authorized to remain in the United States until December 1, 1998, even though that is the same day that he entered the country.

[5]Although we ordinarily review the BIA's opinion, we review the IJ's opinion when the BIA has not rendered its own opinion, but has instead adopted the opinion of the IJ. See, e.g., Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002).

persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

To establish eligibility for asylum on the basis of past persecution, Senoga must show: "(1) one or more incidents rising to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed either by the government or by forces that the government is either unable or unwilling to control." Mulanga, 349 F.3d at 132 (citing Gao, 299 F.3d at 272). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution.[6] Mulanga, 349 F.3d at 132; 8 C.F.R. § 208.13(b)(1). That presumption can be rebutted if the INS establishes by a preponderance of the evidence that, inter alia, conditions in Uganda have changed so as to make Senoga's fear no longer reasonable. Mulanga, 349 F.3d at 132; 8 C.F.R. § 208.13(b)(1)(i)(A). Whether Senoga has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard. Mulanga, 349 F.3d at 131 (citing Gao, 299 F.3d at 272).

Senoga's asylum application is deemed to constitute, at the same time, an application for withholding of removal. 8 C.F.R. § 208.3(b); Mulanga, 349 F.3d at 132.

---

[6]Otherwise, Senoga can demonstrate that he has "'"a well-founded fear of future persecution by showing that [he] has a genuine fear, and that a reasonable person in [his] circumstances would fear persecution if returned to [his] native country."'" Mulanga, 349 F.3d at 132 (quoting Abdulrahman v. Ashcroft, 330 F.3d 587, 592 (3d Cir. 2003) (citing Gao, 299 F.3d at 272)); see also 8 C.F.R. § 208.13(b)(2)(i).

The Attorney General may not, pursuant to 8 U.S.C. § 1231(b)(3)(A), remove an alien to a country if he decides that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." Senoga must show a "clear probability" – i.e. that it is more likely than not – that his life or freedom would be threatened if he is deported. Mulanga, 349 F.3d at 132. This standard is more exacting than that for asylum applications; therefore, if Senoga fails to establish a well-founded fear of persecution for asylum purposes, his application for withholding of removal necessarily fails. Id. (citing Zubeda v. Ashcroft, 333 F.3d 463, 469-70 (3d Cir. 2003)).

The burden of proof is on Senoga to establish his eligibility for asylum and for withholding of removal. He must do so by means of credible testimony, Gao, 299 F.3d at 272, and his credibility, "by itself, may satisfy his burden, or doom his claim." See Dia v. Ashcroft, 353 F.3d 228, 247 (3d Cir. 2003) (en banc).

Our scope of review in immigration cases is "extremely narrow." Findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary, 8 U.S.C. § 1252(b)(4)(B), and we review those facts under the deferential "substantial evidence" standard. Gao, 299 F.3d at 272; see also Ahmed v. Ashcroft, 341 F.3d 214, 216 (3d Cir. 2003); Awolesi v. Ashcroft, 341 F.3d 227, 231 (3d Cir. 2003). "'We will uphold the findings of the BIA to the extent that they are supported by reasonable, substantial and probative evidence on the record considered as a whole, and

7

will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the BIA did.'" Mulanga, 349 F.3d at 131 (quoting Kayembe v. Ashcroft, 334 F.3d 231, 234 (3d Cir. 2003) (citing Gao, 299 F.3d at 272)); see also Tarrawally v. Ashcroft, 338 F.3d 180, 184 (3d Cir. 2003).

Adverse credibility determinations are findings of fact, and must also be based on substantial evidence. Dia, 353 F.3d at 247-48. If based on speculation or conjecture, rather than on evidence in the record, these determinations are reversible. Gao, 299 F.3d at 272. Minor inconsistencies will not support an adverse credibility determination; inconsistencies that involve the "heart" of the applicant's case will. Gao, 299 F. 3d at 272. In sum,

> we must ask whether the determination is supported by evidence that a reasonable mind would find adequate. We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence on country conditions . . . . Where an IJ bases an adverse credibility determination in part on "implausibility" as the IJ did here, such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions.

Dia, 353 F.3d at 249 (internal quotations omitted). Although we defer to the IJ on credibility questions, "'[d]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record.'" Id. (quoting El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003)).

The IJ concluded that Senoga had not shown that there is a reasonable probability, much less a clear probability, of persecution, because he did not believe part of Senoga's

story. For example, the IJ deduced from the 1998 United States Department of State Country Report on Human Rights Practices in Uganda (published in 1999), the Uganda Country Profile for Asylum Adjudicators (published in August 1997), and the testimony of the witnesses that conditions in Uganda stabilized subsequent to the arrest of Senoga's father, and that, given the intervening years, there is no longer interest in harming Senoga's family. In this connection, he observed that, although the Ugandan government has already extracted large amounts of land from Senoga's family, the family still owns its house and enough land to support the mother. The IJ found it implausible that the Ugandan government would not simply confiscate this land if it wished to continue to harm Senoga's family.

But the IJ did not come to this conclusion "against the background of the general country conditions," as Dia requires, and particularly the ongoing human rights situation in Uganda. The 1997 Country Profile, and 1998, 1999, and 2000 country reports[7] each indicate that the Ugandan government's human rights record remains poor, and, although there have been improvements in several areas, there continue to be numerous, serious problems, including the use of excessive force, the use of torture to force confessions, extra-judicial killings, and harsh and life-threatening prison conditions.[8] The IJ did not

_____

[7]The 1999 and 2000 country reports were submitted only to the BIA on appeal.

[8]Although the country profile, published in August 1997, concluded that fear for personal safety based on political opinion seems based on past events, that profile was published before Senoga's arrest in December 1997, and subsequent torture.

9

give this background information adequate weight and his personal opinion that Senoga could not possibly still be in danger was not supported by the evidence.

Other parts of Senoga's testimony, and parts of the testimony of his sister and brother, were similarly rejected by the IJ, but rejected not based on the specific, cogent reasons that our cases require, but based on speculation or conjecture.[9] For example, the IJ found the story of Senoga's escape "so incredible that it pushes the barrier of believability." He could not believe that after the explosion on the bus, Senoga never asked what happened to the armed guards and other prisoners. We, however, are unsure why the IJ thought it so unreasonable that a prisoner who has been tortured for months and has escaped, would, when given the opportunity to flee, not stop to inquire about his captors and fellow prisoners. The IJ also found it hard to believe that, after walking for a day without any idea where he was, Senoga "miraculously encountered" Reverend Wamala, who then assisted him. The IJ, however, did not explain any basis for his somewhat sarcastic rejection of this part of Senoga's story and did not discuss Senoga's testimony that when he asked where he was, and was told, he realized he knew someone there, Reverend Wamala. An IJ must articulate a foundation for his or her disbelief. See, e.g., Mulanga, 349 F.3d at 137-38 (noting, in dicta, that IJ must do more to articulate a foundation for her disbelief regarding alien's escape than to say the proffered explanation

_____

[9]The IJ did accept Senoga's counsel's explanation that Senoga's inability to remember the timing and sequence of his detention and torture might be due to post-traumatic stress.

10

"lacks common sense"). The IJ did not do so here.

The IJ also found it shocking that Senoga has not contacted Reverend Wamala since leaving Uganda, and does not intend to repay him for the plane ticket. He concluded that Senoga's apparent ingratitude was actually an indication that his story was concocted, and that these answers were "from the hip." The IJ does not, however, mention Senoga's testimony that he does not know Wamala's phone number and he does not credit Senoga's fear that Wamala's phone might be tapped. We do not think that, without more, Senoga's failure to contact Wamala adequately supports the IJ's rejection of this part of Senoga's story. We also have difficulty with the IJ's finding that Nathan's testimony that he, and not Wamala, paid for the ticket explains why Senoga did not contact Wamala, i.e. Senoga had no reason to thank or repay Wamala because Senoga made up the whole story. But the IJ does not explain why he dismisses Nathan's testimony that Nathan did not tell Senoga that he paid for the ticket.

The IJ also noted that Senoga claims to have had no contact with his mother, although Nathan speaks to her by phone three times a year. The IJ did not explain how this has any bearing on the asylum application, and, if it did, the IJ should have mentioned the testimony of Senoga's sister, Penina, that she is afraid that if she contacts her mother, she will be putting her mother's life in danger. We note that Penina also testified that, according to friends, her mother's situation has not improved, with soldiers still coming to ask for guns and land, and accusing her of associating with rebels. This testimony

11

surely bolsters both Penina's reluctance to call her mother and Senoga's fear of persecution, yet it was not discussed by the IJ.

We also wonder why the IJ did not believe that Senoga's family has not definitively determined whether two of his brothers are still in jail, and did not believe that there could be conflicting reports as to their whereabouts. We also wonder, in any event, what bearing this has on Senoga's asylum application.

The IJ also emphasized that Penina's and Nathan's returns to Uganda – in 1991 and 1992, respectively – demonstrate that they felt it safe to return, and that they left only because they "stirred up trouble" – Penina by hiring a private investigator, and Nathan by suing the government. The IJ found that their quick departures from Uganda do not support the claim that the family was under constant threats and harassment from 1986 to 1997. Again, it is unclear to us why Penina's and Nathan's trips call Senoga's credibility into question. Moreover, although they may have thought it safe to return to Uganda, they both quickly learned that the government still closely guards any explanation of what happened to their father and used force to do so.

Finally, the IJ was convinced that Penina's decision not to apply for asylum during her five years in Canada demonstrates that she is an economic, not a political, refugee. Again, we do not understand what basis, other than mere speculation, the IJ has for this finding, and he ignores her testimony that she chose not to apply for asylum in Canada because she was afraid that if she did, she would be deported. We also do not see how

12

relevant this finding is to Senoga's application, other than by implicitly suggesting that Senoga's situation must be identical to Penina's. Equating the two siblings, if that is what the IJ did, flies in the face of the unrefuted testimony about Senoga's detention and torture.

In sum, we believe that the IJ's findings "do not flow in a reasoned way from the evidence of record and are, at times, arbitrary and conjectural in nature." Dia, 353 F.3d at 250. While the evidence is not so clear as to compel us to order that Senoga's application for asylum or withholding of removal be granted, there must be "specific, cogent reasons" as to why Senoga is not to be believed.

Thus, we will grant the petition to review, vacate the BIA's order, and remand to the BIA for further proceedings in accordance with this opinion.[10]

---

[10]Because we remand to the BIA, we need not address Senoga's argument that streamlining was inappropriate here. We note, however, that, as we recently held, streamlining in general is neither inconsistent with the Immigration and Nationality Act, nor is it violative of an asylum applicant's due process rights. See Dia, 353 F.3d at 234-45.