NOT PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 15-1116

KAMAL JAMAI,
a/k/a
Jamai Kamal,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

On Petition for Review of an Order of the
Board of Immigration Appeals
Agency No.: A079-734-133
Immigration Judge: Honorable Steven A. Morley

Argued on September 11, 2015

(Opinion filed: December 31, 2015)

Before: VANASKIE, SLOVITER, and RENDELL, Circuit Judges

Christopher M. Cassazza     (Argued)
Law Office of David E. Piver
150 Stafford Avenue
Suite 115
Wayne, PA 19087
*Counsel for Petitioner*

Shahrzad Baghai
Kathryn L. DeAngelis
Thomas W. Hussey
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

Aaron D. Nelson                    (Argued)
United States Department of Justice
Office of Immigration Litigation, Civil Division
Room 6439
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

*Counsel for Respondent*

O P I N I O N[*]

**RENDELL**, <u>Circuit Judge</u>:

Kamal Jamai petitions for review of the decision of the Board of Immigration Appeals ("BIA") reversing the ruling of the Immigration Judge ("IJ") that Jamai was entitled to relief from removal under the Convention Against Torture ("CAT"). Because the BIA did not adequately explain the reasoning underlying its decision, we are unable to meaningfully review that decision. We will therefore vacate the BIA's order and remand for further proceedings.

## I. Background

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

Jamai entered the United States on a non-immigrant B-2 visa in 1999 when he was 16 years old. In 2002, he married a United States citizen, with whom he fathered a child in April 2009. Because of his marriage to a United States citizen, Jamai's application for an adjustment of his immigration status to that of a Lawful Permanent Resident was granted in October 2009.

Jamai has been a heroin addict since 2004. To fund his addiction, Jamai has taken to thievery, for which he has been arrested no fewer than fourteen times in eight years. These arrests led to several convictions, prompting the Department of Homeland Security to charge Jamai with removability pursuant to 8 U.S.C. § 1227(a)(2)(A)(i)-(iii) based on the nature of his convictions. Jamai does not contest that his criminal convictions are of the type that would require his removal under 8 U.S.C. § 1227, but seeks to have his removal deferred under the CAT, *see generally* 8 C.F.R. § 1208.17. Jamai contends that his addiction would almost certainly lead him to relapse into using heroin, which would lead to his arrest and torture by law enforcement in Morocco.

In his hearing before the IJ, Jamai testified that he is addicted to heroin, that he has only refrained from using heroin when in custody, that he has relapsed each time he has been released from custody, that stress triggers his relapses, and that removal to Morocco would cause him considerable stress. Documentary evidence was admitted that describes heroin addiction and relapse, indicating that relapse is stress-induced and that addiction chemically alters the brain. Dr. Abdeslam Maghraoui, a professor at Duke University, testified on Jamai's behalf as an expert on Moroccan political institutions. Dr. Maghraoui testified that drug treatment resources in Morocco are limited and that drug treatment is

3

among the lowest priorities of the Moroccan government. Dr. Maghraoui testified that if Jamai relapsed into his heroin use he would most likely be arrested by authorities in Morocco, whether for purchasing an illegal substance (heroin) or for stealing to purchase heroin. That Jamai has lived his entire adult life in the United States would make him a target for police attention, Dr. Maghraoui testified, because he would be an "outsider" in Moroccan society. Finally, Dr. Maghraoui testified that Moroccan authorities would more likely than not torture Jamai, as the use of torture to secure confessions for unsolved crimes (even those for which the tortured individual is not a suspect) is prevalent in Morocco. Moreover, Jamai's "Americanized" demeanor and attitude concerning individual rights make it likely that the police in Morocco would perceive Jamai as disrespectful and would mistreat him. *See* App. 13-14. Jamai introduced documentary evidence supporting Dr. Maghraoui's opinion testimony, particularly the testimony that drug treatment is largely unavailable in Morocco and that Moroccan authorities often resort to torture to obtain forced confessions.

The IJ credited Jamai's and Dr. Maghraoui's testimony and ruled in favor of Jamai, concluding that Jamai had demonstrated by a preponderance of the evidence that he would be tortured if removed to Morocco.[1] In so concluding, the IJ found each of the following links in a hypothetical chain of events more likely than not to occur: (1) Jamai is a heroin addict; (2) Jamai will relapse if removed to Morocco; (3) Jamai will not seek or receive adequate treatment for his addiction in Morocco; (4) as a result of his addiction

---

[1] The IJ did not rely on Dr. Maghraoui's testimony as to whether Jamai was likely to relapse.

and lack of adequate treatment, Jamai will be arrested by Moroccan authorities; and (5) Jamai will be subjected to torture by the police.

The BIA reversed the decision of the IJ, finding "clear error in the [IJ's] finding that it is more likely than not that [Jamai] will be tortured if removed to Morocco because it is based on a string of suppositions which are unproven on this record." App. 4. The BIA's reasoning for its conclusion was explained in a single paragraph:

> [T]he [IJ] determined, without adequate documentary or qualified expert witness evidence on the issue, that it is more likely than not that [Jamai] will relapse and use heroin in Morocco. While there is some evidence in the record concerning the frequent relapse of heroin addicts, the record lacks testimony from a qualified expert or documentation assessing the likelihood that a person in [Jamai's] specific circumstances is likely to relapse. [Jamai] has been able to refrain from using heroin for more than 2 years and claims to fear severe consequences should he resume its use in Morocco. Furthermore, the [IJ] assumed that [Jamai] would not seek out any treatment that may be available to prevent such a relapse. [Jamai's] evidence also does not prove each step in the hypothetical chain concerning whether the authorities would become aware of any future heroin use and arrest him, that he would then refuse to confess his guilt, and that he thus would be tortured for the purpose of procuring his confession.

App. 4-5 (citations and footnote omitted).

## II. Jurisdiction and Standard of Review

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review the BIA's final order of removal. We review legal determinations by the BIA de novo, although we defer to the BIA's reasonable interpretations of the law. *See Gomez–Zuluaga v. Att'y Gen. of U.S.,* 527 F.3d 330, 339 (3d Cir. 2008) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 838 (1984)). We review factual determinations by the BIA for substantial evidence. *Valdiviezo–Galdamez v. Att'y Gen. of U.S.,* 663 F.3d 582, 590 (3d

5

Cir. 2011). To meaningfully review the BIA's order, however, "we must have some insight into its reasoning," especially when the BIA reverses the IJ's decision. *Toussaint v. Att'y Gen. of U.S.*, 455 F.3d 409, 414 (3d Cir. 2006), *as amended* (Sept. 29, 2006) (quoting *Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003)). Although "the BIA is not required to write an exegesis on every contention," *id.* (quoting *Zudeba v. Ashcroft*, 333 F.3d 463, 477 (3d Cir. 2003)), "the BIA should indicate its reasons for discrediting certain testimony or documentary evidence." *Id.*

### III. Analysis

To qualify for withholding of removal under the CAT, Jamai bears the burden of "establish[ing] that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." *Kaplun v. Att'y Gen. of U.S.*, 602 F.3d 260, 268 (3d Cir. 2010) (quoting 8 C.F.R. § 208.16(c)(2)). There are two distinct parts to the question of whether relief under the CAT can be granted: (1) the factual question of what is likely to happen to Jamai if removed; and (2) the legal question of whether what is likely to happen amounts to the legal definition of torture.[2] *Id.* at 271. In demonstrating that he would likely be tortured if removed, Jamai must demonstrate that each link in the hypothetical chain of events is more likely than not to occur, as "[i]t is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link." *In Re J.F.F.*, 23 I. & N.

---

[2] The BIA reversed on the first of these two questions ("what is likely to happen to the petitioner if removed?") and did not address the second ("does what is likely to happen amount to the legal definition of torture?"). The second is thus not at issue.

6

Dec. 912, 918 n.4 (AG 2006); *accord. Savchuck v. Mukasey*, 518 F.3d 119, 123-24 (2d Cir. 2008).

Here, the BIA rejected the IJ's findings that Jamai would likely relapse if removed to Morocco, leading to his being arrested and tortured by Moroccan authorities. In rejecting the IJ's findings that Jamai was likely to relapse if he returned to Morocco, the BIA stated that the record "lacks testimony from a qualified expert or documentation assessing the likelihood that a person in [Jamai's] specific circumstances is likely to relapse." App. 4-5. But "[t]he likelihood [of] (an inferential fact) may be established through . . . testimony of past experience," *Kaplun*, 602 F.3d at 269, and the IJ credited Jamai's testimony about his past experience of repeated stress-induced relapses into heroin use. The BIA did not discuss this evidence. The BIA did note that Jamai "has been able to refrain from using heroin for more than 2 years," App. 5, but evidence before the IJ showed that Jamai had been incarcerated during this two-year period and that, while Jamai had a history of having drug-free periods while incarcerated, these were followed by relapses upon release from incarceration, s*ee* App 10, 18. The BIA did not discuss this evidence.

Similarly sparse was the BIA's explanation for rejecting the IJ's finding that the other links in the causal chain were more probable than not. The BIA explained that "the [IJ] assumed that [Jamai] would not seek out any treatment that may be available to prevent such a relapse." App. 5. But the IJ reached that conclusion after considering (a) Jamai's history of not availing himself of treatment; and (b) documentary evidence and expert testimony indicating that "there are virtually no available [drug treatment]

7

resources in Morocco." App. 19. The BIA did not discuss any of this evidence. The BIA further asserted that Jamai's "evidence also does not prove each step in the hypothetical chain concerning whether the authorities would become aware of any future heroin use and arrest him, that he would then refuse to confess his guilt, and that he thus would be tortured for the purpose of procuring his confession." App. 5. But Dr. Maghraoui testified as to each of these steps in the hypothetical chain, and the IJ credited his testimony. We do not know whether, or if so, why, the BIA may have rejected this testimony.

By failing to address much of the evidence relied upon by the IJ, the BIA effectively discredited that evidence without explanation, leaving us unable to meaningfully review the BIA's decision. *See Toussaint*, 455 F.3d at 414 ("[T]he BIA should indicate its reasons for discrediting certain testimony or documentary evidence."). Accordingly, we will remand for a more thorough explication by the BIA.

## IV. Conclusion

For the foregoing reasons, Jamai's petition for review will be granted, the BIA's order will be vacated, and this case will be remanded to the BIA for further consideration consistent with this opinion.